## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| RITTIE MARSHALL, Individually and on behalf of all other similarly situated individuals,<br><br>       Plaintiffs,<br><br>v.<br><br>ARC AUTOMOTIVE, INC., AUTOLIV, INC., AUTOLIV ASP, INC., GENERAL MOTORS, LLC<br><br>       Defendants. | Case No.:<br><br><br>CLASS ACTION COMPLAINT<br><br>Jury Trial Demanded |

## INTRODUCTION

1.     This action centers around a critical safety defect present in airbag inflators designed, manufactured, and supplied by ARC Automotive, Inc. ("ARC") and used in millions of vehicles' airbags throughout the country. The vehicles equipped with the defective airbag inflators include the 2007-2010 Cadillac Escalade models marketed and sold by GENERAL MOTORS, LLC ("GM") throughout Tennessee (the "Class Vehicles").

2.     The Class Vehicles' airbag inflators have a common design defect that can cause them to rupture and shoot metal shrapnel into the vehicle during a crash (the "Inflator Defect"). The Inflator Defect can and has caused severe and fatal injuries as a result of the shrapnel impaling and lacerating those seated in the vehicle.

3.     The Inflator Defect results from a combination of several design decisions, including: (i) the use of phase-stabilized ammonium nitrate ("PSAN") in the airbag propellant, which is highly volatile and can exacerbate pressure in the system, which in turn can exert too much force on the metal inflator housing, causing it to rupture; (ii) the choice of a defective friction welding specification that fails to prevent, inspect for, and remove errant metal formations that can

block the Defective Inflators' vents and lead to over-pressurization; and (iii) the failure to incorporate readily available pressure relief valves, which could mitigate increasing pressure and return it to a safe level that would not burst the inflator canister.

4.       The Inflator Defect is present in ARC's toroidal stored gas hybrid inflators equipped in both driver and passenger airbags (the "Defective Inflators"), which were assembled into airbag modules manufactured by AUTOLIV, INC. and AUTOLIV ASP, INC. (the "Autoliv Defendants"), which in turn were installed into the Class Vehicles by GM.

5.       Plaintiff and the Class paid large sums of money to purchase and lease Class Vehicles. At the time of purchase and lease, Plaintiff and the Class did not know of the Inflator Defect because the Defendants failed to disclose and concealed the defect's existence. As such, Plaintiff and the Class suffered an economic injury at the point of sale and lease as they either paid money for vehicles they otherwise would not have purchased or leased or paid more to do so than they otherwise would have had the defect been disclosed.

6.       The Inflator Defect places Plaintiff and the Class at risk for serious and fatal injuries should their airbag rupture. Indeed, at least two deaths and multiple severe injuries have been connected to the Inflator Defect—spurring an ongoing investigation by the National Highway Traffic Safety Administration ("NHTSA"), as well as multiple limited recalls.

## PARTIES, JURISDICTION, AND VENUE

7.       ARC is incorporated in Delaware and maintains its principal place of business in Tennessee.

8.       Defendant AUTOLIV, INC. is incorporated in Delaware and maintains its principal place of business in Sweden.

9.    Defendant AUTOLIV ASP, INC. is formed under the laws of Indiana and maintains its principal place of business in Utah. AUTOLIV ASP, INC., operates five manufacturing facilities in the United States, all in Utah, that manufacture airbag modules and components, including inflators and propellant. AUTOLIV ASP, INC., also operates two Autoliv Technical Centers in the United States, one in Utah and one in Michigan, that help develop, design, and test airbag modules and their components for various vehicle platforms.

10.    AUTOLIV, INC. created and operates AUTOLIV ASP, INC. to develop, design, test, market, promote, and distribute Autoliv-brand automotive component parts and accessories, including the airbag modules at issue in this lawsuit, throughout the United States, including Tennessee. They will be collectively referred to as the "Autoliv Defendants." The Autoliv Defendants acquired Delphi Automotive, which produced earlier model year Class Vehicle airbag modules using the Defective Inflators, in 2009.

11.    GM is a Delaware corporation with its principal place of business in Michigan. GM owns, designs, manufactures, and distributes the Cadillac brand of vehicles.

12.    Plaintiff RITTIE MARSHALL resides in Memphis, Tennessee, and is the owner of a 2007 Cadillac Escalade. Plaintiff did not know the Escalade's airbag had a Defective Inflator at the time she purchased the vehicle. If the Inflator Defect had been disclosed, she either would not have purchased the vehicle or would have paid less money to do so.

13.    This case presents minimal diversity and the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and as such, this Court has diversity jurisdiction under the Class Action Fairness Act (28 U.S.C. § 1332(d)(2)(A)).

14.    ARC is subject to jurisdiction before this Court because it maintains its principal place of business and conducts substantial business within the State.

15.     The Autoliv Defendants are subject to jurisdiction before this Court because, at all relevant times, they: (i) are registered to do business in the State (through AUTOLIV ASP, INC.); (ii) engaged in substantial business within the State, including through their relationship with ARC, which is headquartered in Tennessee, where it maintains facilities that design, manufacture, and sell the Defective Inflators, which the Autoliv Defendants have, upon information and belief, regularly inspected and knew to be one production location for the Defective Inflators at issue in this action; (iii) designed, manufactured, assembled, marketed, and sold vehicle components and accessories, including the airbag modules at issue, throughout the United States, including in Tennessee; and (iv) provided replacement airbag modules and other automotive parts, repairs, and warranty services to customers, dealers, and business partners throughout Tennessee, including for GM's many customers and dealerships located throughout the State.

16.     GM is subject to jurisdiction before this Court because it: (i) is registered to do, and does, significant business within the State; (ii) has four manufacturing facilities within the state, including a distribution center in Memphis, Tennessee; (iii) maintains a vast dealership network within the State to market, promote, sell, lease, and service GM vehicles, including the Class Vehicles; and (iv) markets, advertises, and otherwise promotes the sale and lease of GM vehicles within the State, including the Class Vehicles.

17.     Venue is proper under 28 U.S.C. § 1391(a)-(c) because the Defendants do substantial business within this District, including by designing, distributing, marketing, selling, and servicing Class Vehicles throughout the District, and Plaintiff, like many other class members, purchased her Class Vehicle within this district.

## I.   FACTUAL ALLEGATIONS

**A.   The Class Vehicles' Defective Inflators**.

18.   Airbags are safety devices which are intended to protect drivers and passengers during crashes. They work by inflating a cushion with gas in the event of a crash; the cushion then provides impact protection for the vehicles' occupants.

19.   The airbags in the Class Vehicles rely on ARC's Defective Inflators to inflate the cushion during a crash.

20.   ARC's Defective Inflators rely on highly compressed gas and a chemical propellant that heats the gas, which then fills the airbag cushion with air during a crash.

21.   The propellant chosen by ARC includes phase-stabilized ammonium nitrate ("PSAN"). PSAN is controversial because of its volatile nature, which can cause it to burn very fast and very hot when compared with other chemicals more commonly used in airbag propellants. This rapid burning rate in turn exponentially increases pressure within the inflator canister.

22.   When too much pressure is exerted on the metal canister housing the airbag propellant and gas, the metal canister can rupture and break into pieces.

23.   There has, at all relevant times, existed a wide array of propellant choices. PSAN is amongst the least expensive of the options.

24.   PSAN has only been used by a few airbag inflator manufacturers because of its dangerous and volatile nature.

25.   The fatal danger posed by PSAN's volatility was seen in the hundreds of Takata airbag ruptures and resulting recalls and corresponding litigation, which remains ongoing to this day and is the largest automotive recall in the history of the United States.

26.     ARC has long known that PSAN's volatile nature makes it difficult to safely and reliably use.

27.     For example, ARC's 1995 patent application entitled "Eutectic Mixtures of Ammonium Nitrate and Amino Guanidine Nitrate" acknowledges that ammonium nitrate "undergoes certain phase changes during temperature variations causing cracks and voids if any associated binder is not sufficiently strong and flexible to hold the composition together."

28.     Likewise, in its 1998 patent application entitled "Nonazide Ammonium Nitrate Based Gas Generant Compositions that Burn at Ambient Pressure," ARC acknowledged that PSAN "is a problem since many gas generant compositions containing this oxidizer have unacceptably low melting points and are thermally unstable."

29.     ARC's 2018 patent application entitled "Non-Ammonium Nitrate Based Generants" similarly acknowledged that:

> With ammonium nitrate based generants becoming unacceptable for usage in automotive airbag inflator applications regardless whether they are used in pyrotechnic or hybrid type inflators, alternate or non-ammonium nitrate containing generants are highly desirable. Even in a hybrid inflator where the generant is stored in a high-pressure inert gas atmosphere making moisture intrusion nearly impossible, ammonium nitrate based generants are still considered unacceptable.

30.     Because PSAN reacts exponentially to increases in pressure, it must only be used when the inflator has been properly designed to prevent over-pressurization. ARC, however, designed the inflator in a way that promoted over-pressurization and with no means to relieve that pressure.

31.     First, ARC chose to use a fundamentally flawed friction welding design specification. Friction welding refers to a process in which rotational force causes metal to soften so that two or more pieces can be welded together. Because the metal is rotating as it softens,

pieces of the metal can be flung into unintended locations and harden. This is called "weld flash" or "flash."

32.     Weld flash is a well-known problematic byproduct of friction welding that can break off and interfere with the welded product's function.

33.     In the ARC inflators, the flash weld forms on the interior central support column, which is welded at the same time the two outer shells of the inflator are welded. During a deployment, the flash may break of and obstruct the exhaust port through which the gas exits to the airbag cushion. This can prevent gas from escaping the inflator. When the gas cannot escape, it accumulates and begins to exert greater and greater pressure on the canister, with the potential of an eventual rupture.

34.     To address the known problems of weld flash, properly designed friction welding processes include means to either: (i) prevent weld flash from happening; or (ii) inspect the interior of the welded cannister to ensure that no weld flash occurred in a dangerous location (i.e., inside the center support column) and then, if weld flash is detected, the unit is either scrapped or the weld flash is removed.

35.     Designing the friction welding process to prevent flash or to include internal inspections is critical because flash located inside of the inflator cannister and on the central support column cannot be seen through a visible exterior inspection.

36.     ARC, however, chose to use a friction welding process that did not prevent weld flash, did not check for weld flash, and did not remove flash or reject inflator canisters that had flash inside the center support column.

37.     The dangers presented by ARC's friction welding process are exacerbated by PSAN's volatility, which can exponentially increase the pressure already created by gas trapped within the inflator canister by a blocked vent.

38.     Notably, while recalling a certain lot of ARC's inflators in 2017, Ford observed that its "[p]reliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier [ARC] may obstruct the gas exhaust port."

39.     Despite choosing design features (PSAN-based propellant and friction welding without weld flash protection protocols) that presented a grave risk of over-pressurization, ARC also chose to ignore readily available design features that could mitigate pressure.  One such option would have been to install pressure relief valves, which would have relieved the metal canister of the forces being exerted on it, preventing a rupture.

40.     Indeed, back in the early 2000s, TRW—which is one of the few other inflator manufacturers to ever use a PSAN-based propellant—incorporated a pressure relief valve that allowed gas to escape in the event of over-pressurization.

41.     The fact that TRW's pressure relief valve was used back in the early 2000s confirms that this design feature was available well before the Class Vehicles were designed, manufactured, and then sold and leased to Plaintiff and the Class.

42.     ARC has likewise developed its own pressure relief valves—which were not present in the Defective Inflators used in the Class Vehicles' airbags.

43.     In a 2013 patent application entitled "Variable Orifice Construction," ARC described a design in which the inflator's exit orifice would increase along with the gas pressure inside the inflator—allowing for effective pressure relief.

44.     Likewise, in a 2020 patent application entitled "Airbag Inflator With Pressure Relief Valve and Increased Combustion Efficiency," ARC described a hybrid inflator design containing vent holes and sub-chambers to afford ventilation, combined with so-called "flow diverters" to "direct and control pressure and flow." ARC further explained:

> Some existing inflator assemblies utilize a center support structure that requires two simultaneous welds, which is problematic in respect of manufacturing and also increases the potential for weld particles to exit the inflator upon deployment. Existing designs have also been configured to fragment during deployment as a consequence, in the event of excessive pressure increase within the inflator due to some failure or external condition or the like, these existing inflator designs can be potentially hazardous for vehicle occupants.

> * * *

> It would be desirable to provide an airbag inflator that reduces gaseous effluents with efficient combustion while incorporating additional safety features in respect of venting and unintended increases in internal pressure and weld particles.

45.     The three design flaws identified above—the use of PSAN and deficient friction welding which did not prevent, inspect for, or address weld flash, combined with the lack of any effective pressure relief valves—rendered the Class Vehicles' airbags subject to the risk of fatal ruptures. Collectively, these design flaws comprise the Inflator Defect.

**B.     The Defendants failed to disclose and concealed the Inflator Defect to enrich themselves at the expense of Plaintiff and the Class.**

46.     As a "Tier 2" supplier, ARC supplies airbag inflators to "Tier 1" suppliers, which then assemble the inflators into an airbag module. The Tier 1 supplier then supplies the airbag module to the original equipment manufacturer ("OEM"), aka the automobile manufacturer, which installs the airbag module into vehicles to be sold to consumers throughout the country, including in Tennessee.

47.     In this case, ARC supplied the airbag inflators to Autoliv, which in turn assembled the inflators into the airbag modules. Autoliv then supplied the modules to GM, which installed the modules containing the Defective Inflators in the Class Vehicles.

48.     The supply chain and working relationship between OEMs down through the Tier 1 and 2 suppliers requires an ongoing collaboration and exchange of information to ensure that the right products are provided and are compatible with the vehicle systems into which they will be incorporated.

49.     The Tier 1 supplier, Autoliv here, will first obtain the technical specifications and testing requirements from the OEM. The Tier 1 supplier will then obtain the requisite design and testing documentation from the Tier 2 supplier, ARC here, to ensure that the OEM's (GM's) technical requirements will be met by the Tier 2 supplier's component parts (in this case, airbag inflators).

50.     Upon information and belief, the initial information exchange between GM, Autoliv, and ARC would have revealed the use of PSAN in the propellant, as well as the usage of friction welding and the lack of pressure relief valves.

51.     The information gathering process does not stop at the initial stages. When problems are reported with the component—whether in production, in testing, or during real-world crashes or product failures—the OEM requests further technical information from the Tier 1 and 2 suppliers and reviews all documentation previously created in relation to the component.

52.     As detailed further below, ARC's Defective Inflators have a history of field ruptures, recalls, and an ongoing NHTSA investigation—meaning that there was likely a frequent exchange of information between each Defendant regarding the design decisions in the Defective Inflators—including the use of PSAN, friction welding, and the lack of pressure relief valves.

53.     The dangerous volatility of PSAN was highlighted for each Defendant during the Takata airbag recall, which also involved defective PSAN-based inflators and dominated media headlines for several years. GM, in particular, was significantly involved in the Takata investigation and recalls.

54.     Additionally, Penn State's High Pressure Combustion Laboratory identified and described PSAN's susceptibility to "dynamic burning"—i.e., PSAN's exponential response to pressure increases which causes the PSAN to burn faster and hotter than expected—in a report published in 2012. The researchers further concluded that the "dynamic burning" process leads to over-pressurization.

55.     Given their involvement in the industry, Defendants likely knew of the 2012 Penn State report as soon as it was published. Moreover, this report was prominently discussed by the *New York Times* during its Takata coverage in 2015—a fact that Defendants also almost certainly knew about given their roles within the automotive industry.

56.     Despite their knowledge of the dangers of PSAN: (i) ARC continued to sell and supply Defective Inflators with the deficient friction welds and without pressure relief valves; (ii) Autoliv continued to assemble those Defective Inflators into airbag modules; and (iii) GM continued to use those airbag modules containing Defective Inflators in the Class Vehicles it released onto the market and which were sold and leased to Plaintiff and the Class.

57.     The average reasonable consumer would have no way of knowing that the Class Vehicles had ARC's Defective Inflators in their airbags. Indeed, the average reasonable consumer would have no way of even knowing which type of airbag inflator was used in their vehicle—let alone the design features of those inflators. Instead, Plaintiff and the Class expected, as would any

average reasonable consumer, that the Class Vehicles had properly designed airbags that did not have a dangerous defect that could cause them to expel metal shrapnel toward occupants.

58.     As a result, Defendants have been greatly profited and enriched by their failure to disclose the Inflator Defect, which caused Plaintiff and the Class to suffer economic injury as they purchased and leased Class Vehicles without notice of the Inflator Defect.

**C.     ARC's Defective Inflators have ruptured and caused severe and fatal injuries, prompting an ongoing NHTSA investigation.**

59.     ARC's Defective Inflators have ruptured several times—both during testing and in vehicles that had already been released onto the market. Ruptures are an extremely rare event in airbags that do not contain ammonium nitrate as a propellant. As a result, the mere fact that ARC's Defective Inflators have ruptured several times—under various operating conditions, in various locations, and including inflators produced in different facilities at different times—is strong evidence of a uniform design defect.

60.     Government investigative materials and civil lawsuits document seven reported ruptures of ARC's Defective Inflators in vehicles driven by ordinary consumers, resulting in two fatalities and several severe injuries, as well as two ruptures that occurred during testing. Upon information and belief, the reported ruptures are not the only ones that have occurred; they are just the only ones that have been publicly reported to date.

61.     The ruptures began occurring just as the Takata investigation was getting underway, which should have engendered significant concern amongst the Defendants.

62.     In 2009, a 2002 Chrysler Town & Country van's driver side ARC inflator ruptured. The publicly available information does not reveal whether the driver sustained injuries.

63.     In 2014, a 2004 Kia Optima's driver-side ARC inflator ruptured in New Mexico, resulting in serious injuries to the driver. The driver brought a personal injury lawsuit against Kia and ARC, which quickly and confidentially settled the matter.

64.     There was another ARC inflator field rupture in 2014, but there is no publicly available information as to the circumstances of that incident.

65.     In 2016, a 2009 Hyundai Elantra's driver-side inflator ruptured and killed a driver in Canada, prompting a recall of certain 2009 Elantra vehicles in Canada (but not in the U.S.).

66.     In 2017, a 2011 Chevrolet Malibu's driver side inflator ruptured during a crash in Pennsylvania. GM subsequently recalled certain 2010-2011 Chevrolet Malibu vehicles which had inflators from the same lot as the one which had ruptured. In issuing this recall, GM represented to NHTSA and the public that the problem was isolated to the recalled lot—and, in doing so, failed to disclose the fundamental design flaws contained in all of the Defective Inflators which can lead to over-pressurization within the airbag cannister.

67.     Two of ARC's passenger inflators also ruptured during testing in 2017, resulting in recalls issued by Ford and BMW.

68.     A 2021 Michigan rupture resulted in the second reported fatality. In that case, a 2015 Chevrolet Traverse's driver-side ARC inflator ruptured and killed a mother of ten, with four of her children in the vehicle with her. The mother's Estate subsequently filed a wrongful death lawsuit, which is pending. The police report states that parts of the metal inflator were found lodged in the driver's neck during the autopsy, and that:

> It appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag.

69.     Another 2021 rupture—this one occurring in California—caused severe laceration injuries to the front seat passenger in a 2015 Audi A3. The passenger filed a personal injury lawsuit, which remains pending. Volkswagen issued a limited recall following this rupture.

70.     ARC's Defective Inflators have ruptured in many different types of locations, in different makes and models, and both "in the lab" and "in the field." And the ruptures occurred in inflator units produced in various factories throughout the world from 2001 through 2017.

71.     The one constant variable in all of the ruptures is the Defective Inflators' use of PSAN-based propellant and friction welding without any pressure relief valves.

72.     Despite the constant variable in the known ruptures being the use of the Defective Inflators, none of the Defendants have recalled all vehicles using this same inflator design. Instead, they've issued only very limited recalls.

73.     In July 2015, NHTSA opened Preliminary Investigation (PE15-027) into 490,000 ARC hybrid inflators, stating that those inflators "may rupture" and cause "metal fragments" to be "propelled into the passenger compartment." The Agency explained that it initiated the investigation after receiving reports of the 2009, 2014, and 2015 ruptures described above.

74.     NHTSA upgraded the Preliminary Investigation into a more detailed Engineering Analysis (EA16-003) in August 2016, after learning about the fatal 2016 rupture that killed a Canadian driver.

75.     The NHTSA investigation remains ongoing. NHTSA has so far not released any conclusions. It has also not released many investigation materials, other than letters it sent to OEMs, Tier 1 Suppliers, and ARC (but not their responses to the letters).

76.     ARC has apparently been less than cooperative with NHTSA during its investigation, as demonstrated in NHTSA's October 4, 2016 letter admonishing ARC for failing

to disclose rupture incidents as required by law, and otherwise impeding the investigation. In that

letter, NHTSA stated

> [B]eyond ARC's lax response to compulsory process, ARC's attitude and approach to the Agency's investigation remains troubling. Since this investigation was opened, ARC has on more than one occasion questioned the necessity of providing certain information, failed to provide documents in a readable format, appeared nonchalant in its approach to developing a testing plan or protocol, and has advocated for the closure of the investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures.

> Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls, and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify the Agency of these incidents, or their potential relationship to the incidents under investigation. After the Agency learned of one of these incidents earlier this year, the Agency contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised Agency staff for indicating otherwise.

> Compounding ARC's failure to inform the Agency of these matters, ARC has also failed to comply with Standing General Order 2015-02A, issued in the underlying Preliminary Evaluation, which requires ARC to file a report within five days of receiving notification of an inflator field rupture. On July 8, 2016, a fatal rupture occurred in Newfoundland, Canada. NHTSA was notified of this incident on by both Transport Canada and by Hyundai. Although ARC was clearly notified of the incident, as demonstrated by ARC's attendance at an inspection of the vehicle that occurred on July 26, 2016, ARC has failed to provide any report to NHTSA regarding that incident. As noted by the Standing General Order, failure to comply with that obligation calls for the imposition of daily civil penalties.

> ARC's response to the Agency's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, must less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues. ARC has been given every consideration, yet has failed to respond in kind.

77.     As stated above, several OEMs have issued limited recalls for certain subsets of vehicles equipped with ARC's Defective Inflators, including three recalls by GM. Those recalls have been limited to only those vehicles containing an inflator produced in the same lot as a ruptured inflator.

78.     First, in March 2017, BMW recalled certain 2017 X5 models following a rupture in ARC's internal testing facilities.

79.     Ford then recalled certain 2017 F150 and Mustang models following a rupture in ARC's internal testing facilities in August 2017.

80.     In January 2019, GM recalled certain 2010-2011 Chevrolet Malibu vehicles after a rupture that severely injured a driver.

81.     In October 2021, GM recalled limited subsets of 2013-2017 Chevrolet Traverse and 2008-2017 Buick Enclave models following the rupture that killed a mother of ten in Michigan. Then, in April 2022, GM recalled a limited subset of 2015 Traverse, Enclave, and Acadia models after another rupture in a 2015 Traverse.

82.     Most recently, in July 2022, Volkswagen recalled certain 2016 Audi TT, Audi TT Roadster, TT Coupe, S3 Sedan, R8 Coupe, A3 Sedan, A3 Sportback e-tron, A3 Cabriolet, Golf SportWagen, Golf R, Golf GTI, Golf Mk7, and battery-electric e-Golf hatchback models in July 2022 following the 2021 California ARC inflator rupture resulting in severe physical injury.

## II.     CLASS ACTION ALLEGATIONS

83.     The Class Definition. Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff will seek certification of a class consisting of: **"All persons who purchased or leased a 2007-2010 Cadillac Escalade in Tennessee."**

84. All persons asserting claims for personal injury due to an alleged defect in one of the Class Vehicles' airbags are specifically excluded from the Class.

85. <u>Numerosity</u>. The Class consists of well in excess of 1,000 individuals, making it impractical to join all members into a single litigation as individual plaintiffs.

86. <u>Ascertainability</u>. The Class members can be readily identified through Defendants' sales records, production records, and other similar materials, as well as through state registration records and other publicly available means.

87. <u>Predominance</u>. Questions of law and fact with answers which are common to each Class member predominate over questions affecting each member as an individual. Those common questions include:

  a. Whether the inflators in the Class Vehicles' airbags are defective;

  b. The cause of the Inflator Defect;

  c. Whether the Defendants knew that the inflators in the Class Vehicles' airbags are defective;

  d. When the Defendants first learned that the inflators in the Class Vehicles's airbags are defective;

  e. Whether the Defendants had a duty to disclose the Inflator Defect to Plaintiff and the Class;

  f. Whether the Defendants failed to disclose the Inflator Defect to Plaintiff and the Class;

  g. Whether the Defendants concealed the Inflator Defect from Plaintiff and the Class;

h. Whether the Inflator Defect would be material to an ordinary reasonable consumer considering whether to purchase or lease a Class Vehicle;

i. Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle if the Inflator Defect had been disclosed to them;

j. Whether the Class Vehicles suffered a diminution in value as a result of the Inflator Defect;

k. The amount of diminution in value the Inflator Defect has caused the Class Vehicles to suffer;

l. Whether the Defendants' conduct tolls any or all statutes of limitations or other time limitations for the Class to bring claims;

m. Whether the Defendants violated consumer protection laws by failing to disclose or concealing the Inflator Defect;

n. Whether Defendants breached any express warranties by failing to disclose and remedy the Inflator Defect;

o. Whether Defendants breached any implied warranties by failing to remedy the Inflator Defect;

p. Whether the Class Vehicles were unfit for the ordinary purpose for which they are used;

q. Whether the Class members are entitled to damages, and if so, the types and amount; and

r. Whether the Class is entitled to injunctive and declaratory relief, and if so, the specific type of injunctive and declaratory relief which should be afforded.

88.    <u>Typicality</u>. Plaintiff's claims arise out of the same course of conduct as the rest of the Class and can be remedied in the same way as the other Class members' claims.

89.    <u>Adequacy</u>. Plaintiff will fairly and adequately represent and protect the interest of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products, and have the financial resources to vigorously prosecute this case. Neither the Plaintiff nor their counsel have interests adverse to those of the Class.

90.    <u>Superiority</u>. A class action is superior to the other means available to resolve the issues presented in this case and obtain relief for the Class because the size of each individual Class members' claim does not economically justify an individual lawsuit, which would have to be litigated against multinational corporations with extensive resources and sophisticated legal counsel. The class action will allow the Class members' rights to be vindicated in a fair and equitable manner, while also serving the interests of judicial economy by preventing piecemeal litigation.

91.    <u>Injunctive and Declaratory Relief</u>. Defendants acted or refused to act on grounds generally applicable to the Class, making equitable relief and restitution appropriate to the Class.

92.    <u>Particular Issues</u>. All common issues identified above are particular and common to all Class members such that resolution for each or all would materially advance the resolution of this action and serve the interests of judicial economy.

### COUNT I: Tennessee Consumer Protection Act of 1997
*Against all Defendants*

93.    Plaintiff brings this claim for violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-101, *et seq.*, individually and on behalf of the Class against all Defendants, and realleges paragraphs 1 through 92.

94.    The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce[.]" Tenn. Code Ann. § 47-18-104(a).

95.    Defendants are "persons" as defined by Tenn. Code Ann. § 47-18-103(3).

96.    Plaintiff and the Class are "consumers" as defined by Tenn. Code Ann. § 47-18-103(3).

97.    Defendants owed a duty to disclose the Inflator Defect because they: (i) had superior knowledge of the defect as compared to Plaintiff and the Class, who had no way of knowing about the design of the airbag inflators used in the Class Vehicles; (ii) made incomplete representations regarding the Class Vehicles' safety; and (iii) intentionally concealed the Inflator Defect from Plaintiff and the Class.

98.    The Class Vehicles' safety was a material term of the transaction. The safety of the airbags was encompassed by this material term.

99.    Defendants violated the TCPA by participating in misleading, false, and deceptive acts, including by failing to disclose and concealing the Inflator Defect from Plaintiff and the Class.

100.    Defendants' failure to disclose and concealment of the Inflator Defect could readily mislead an ordinary reasonable consumer as to the Class Vehicles' Safety.

101.    Defendants profited by failing to disclose and concealing the Inflator Defect from Plaintiff and the Class, because had they known, Plaintiff and the Class either would not have purchased or leased the vehicles or would have paid less to do so.

102.    Plaintiff and the Class suffered injury as the direct and proximate result of Defendants' TCPA violations because they spent money to purchase and lease Class Vehicles.

103.    Plaintiff, individually and on behalf of the Class, seek an injunction to prohibit Defendants from further engaging in the TCPA violations alleged above, actual damages, treble

damages for Defendants' willful and knowing violations, attorney's fees and costs, and all other relief available under the TCPA.

## COUNT II: Express Warranty
### *Against GM*

104.    Plaintiff brings this claim individually and on behalf of the Class against GM, realleging paragraphs 1 through 92, for breach of express warranty.

105.    The Class Vehicles are "goods" under Tenn. Code Ann. §§ 47-2-105(1) and 47-2A-103(1)(h).

106.    GM was and is a "merchant," "seller," and "lessor" of motor vehicles under Tenn. Code Ann. §§ 47-2-103-04.

107.    Plaintiff and the Class are "buyers" and "lessees" under Tenn. Code Ann. §§ 47-2A-103(1)(n) and 47-2-313(1).

108.    Defendant issued an express written warranty that the airbag would be free of defects in materials and workmanship and repairs would be provided, free of charge, should there be any defects in materials or workmanship, for each Class Vehicle.

109.    Defendant's express written warranty was a material term to the transaction and the basis of the bargain, for each Class Vehicle.

110.    Defendant breached its express warranty by selling the vehicles with the Inflator Defect, failing to disclose the Inflator Defect, and failing to provide the repairs or replacements needed to remedy the Inflator Defect.

111.    Defendant's breach of warranty directly and proximately caused Plaintiff and the Class to suffer damages as alleged throughout this Complaint. Accordingly, Plaintiff, individually and on behalf of the Class, seek all available damages, injunctive and equitable relief, and attorneys' fees and costs.

## COUNT III: Implied Warranty
### *Against GM*

112.    Plaintiff brings this claim individually and on behalf of the Class against GM, realleging paragraphs 1 through 92, for breach of implied warranty.

113.    The Class Vehicles are "goods" under Tenn. Code Ann. §§ 47-2-105(1) and 47-2A-103(1)(h).

114.    GM was and is a "merchant," "seller," and "lessor" of motor vehicles under Tenn. Code Ann. § 47-2-103-04.

115.    Plaintiff and the Class are "buyers" and "lessees" under Tenn. Code Ann. §§ 47-2A-103(1)(n) and 47-2-313(1).

116.    Defendant implied a warranty for each Class Vehicle sold or leased in Tennessee, including that the vehicle was in a merchantable condition, under Tenn. Code Ann. §§ 47-2-314 and 47-2A-212.

117.    Defendant breached its implied warranty because, as a result of the Inflator Defect, the vehicles are not merchantable, they do not have the quality a buyer would reasonably expect, they would not pass without objection in the automotive trade, they are unsafe to drive and unfit for their ordinary purpose, and they do not conform to their labels' representation that they are safe and suitable for their intended use.

118.    Defendants' breach of warranty directly and proximately caused Plaintiff and the Class to suffer damages. Accordingly, Plaintiff, individually and on behalf of the Class, seeks all available damages, injunctive and equitable relief, and attorneys' fees and costs.

## REQUEST FOR RELIEF

119.    Plaintiff, individually and on behalf the Class, requests entry of Judgment against the Defendants for:

a.      Certification of this case as a class action;

b.      Appointment of Plaintiff as the Class Representative;

c.      Appointment of Plaintiff's counsel as Class Counsel;

d.      A declaration that Defendants violated the TCPA;

e.      An injunction requiring Defendants to cease the TCPA violations at issue in this case;

f.      A declaration that GM breached its express warranties to Plaintiff and the Class;

g.      A declaration that GM breached its implied warranties to Plaintiff and the Class;

h.      An award of all available actual damages, compensatory damages, statutory damages and penalties, restitution, punitive damages, and attorneys' fees and costs; and

i.      An award of prejudgment and postjudgment interest.

Respectfully submitted,

**WELLS & ASSOCIATES, PLLC**

/s/ Murray B. Wells
Murray B. Wells  (21749)
81 Monroe Avenue – Suite 200
Memphis, TN 38103
(901) 507-2521
wells@thewellsfirm.com